| | | |
|---|---|---|
| LOUIS MONSOUR and ZEYNA FARIS | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No.  SA-08-CV-917-XR |
| | § | |
| COMPANIES INCORPORATED, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

On this date, the Court considered the motion for summary judgment (Docket Entry No. 21) filed by Defendants Companies Incorporated and Kevin Wessell and the response and reply thereto. The Court GRANTS the motion for summary judgment in part with respect to Plaintiff Monsour's individual claim for breach of contract and claims based in tort and Plaintiff Faris's claims based in tort. The Court DENIES the motion for summary judgment with respect to the claims brought under the Deceptive Trade Practices Act,  Plaintiff Faris's breach of contract claim, and the contract and tort claims brought by Monsour and Faris as a partnership entity.  The Court also considered Plaintiffs' motion to strike Defendants' motion for summary judgment evidence (Docket Entry No. 24) and hereby DENIES that motion.

## Background

Plaintiffs initially filed this lawsuit in County Court at Law Number 2 of Bexar County, Texas.  It was removed to this Court on the basis of diversity jurisdiction.  In Plaintiffs' First Amended Petition, Plaintiff Louis Monsour alleges that on August 16, 2006, he paid Defendant

Companies Incorporated ("Companies") $19,604[1] and purchased an entity with a $1 million line of credit to be used for real estate investment opportunities. Monsour claims that Matt Mitchell, a Companies representative, informed him prior to this purchase that there would be no credit checks, no collateral, and no personal guarantees required to obtain the line of credit; that the only thing required was the subject real estate property; and that the loan would be based on the loan-to-value ratio of the property. Monsour alleges that Mitchell sent him a weblink via e-mail to a Companies website with "Frequently Asked Questions"("FAQ") about these entities, which stated that the entities had a guaranteed existing $1 million line of credit that is ready to use. Monsour states that he told Mitchell that he was not interested in purchasing another entity or in the other programs advertised in the FAQ (*e.g.*, real estate training and a credit building program) and that he only wanted the guaranteed existing line of credit. Mitchell allegedly explained that all parts of the package must be purchased to access the line of credit. Monsour claims that he based his purchase on the assurances of Mitchell and Defendant Wessell that the $1 million line of credit would be "made available to him" if he followed the instructions taught in the training course.

Monsour alleges that in November 2006, he had the opportunity to purchase a residence located at 220 West Oak Estates Drive for $470,000 and that the property was valued at $850,000 to $1,000,000. He claims that Companies referred him to Gordon Englert, who sent Monsour a sample package on how to structure the deal to purchase the property. On September 18, 2006, at Monsour's request, Englert sent a letter for the mortgage company, written on Midwest Funding & Financial Corporation ("Midwest Funding") letterhead, allegedly indicating that Global IPC, Inc.,

---

[1]It appears undisputed that the actual payment of $19,604 was made using a credit card in the name of Plaintiff Zeyna Faris.

an entity owned by Monsour, had an available line of credit in the amount of $1 million. Monsour asserts that on November 8, 2006, the mortgage company indicated that he could purchase the property for $470,000, and he submitted the package (apparently to Companies) on November 9 with a requested price, at Englert's instruction, of $600,000. Monsour states that on November 10 and 11, he attended real estate training in California hosted by Endeavor, Inc., and that he was told that Rusty Fields, Endeavor's owner, approved the packaging of all deals. Monsour alleges that Fields and Wessell (who also was present) were "overjoyed" with the proposal for purchase of the property, but suggested using a lender named Travis instead of Midwest Funding.

Monsour claims that on November 16, Travis and an individual named Ron Jarvis stated that they did not want to finance the deal and wanted Monsour to put his house up as collateral or settle for a smaller first loan and look for a second loan to finance the rest of the deal. Monsour allegedly referred to the terms that had been represented to him by Companies, and then e-mailed Wessell. On November 18, Wessell allegedly asked Monsour to assign twenty percent of the profits from the property for Wessell's benefit and Wessell would be the signatory on the loan. Monsour claims that he agreed because he wanted to purchase the property before someone else did. He then alleges that after Mitchell and Wessell did not return his calls, he contacted Wessell on December 11, 2006, asking for reimbursement of the money Monsour had paid for the guaranteed $1,000,000 line of credit that was not provided.

Monsour also alleges that he attempted to purchase other pieces of real estate, but that Companies never delivered on their promise to secure financing and told him repeatedly only that he should look for other real estate. Plaintiffs bring claims for breach of contract, fraud in the inducement, negligent misrepresentation, and violations of the Texas Deceptive Trade Practices Act

(DTPA).[2] Plaintiffs also assert that Companies Incorporated and Midwest Funding & Financial Corporation are merely the alter egos of Kevin Wessell, Matt Mitchell and Gordon S. Englert. On April 7, 2009, this Court dismissed Plaintiffs' claims against Midwest Funding & Financial Corporation and Matt Mitchell for lack of personal jurisdiction. (Docket Entry No. 13.) This Court dismissed Gordon S. Englert as a defendant on April 20, 2009, for the Plaintiffs' failure to respond to the Court's Order to Show Cause. (Docket Entry No. 16.)

**Defendants' Motion for Summary Judgment**

The remaining Defendants, Companies Incorporated and Kevin Wessell, move for summary judgment on all claims. Defendants contend that: (1) there is no evidence that a contract existed between Defendants and either Plaintiff; (2) assuming nevertheless that a contract existed, it cannot be enforced because it is too vague and did not comply with the statute of frauds; (3) Plaintiffs' tort claims must be dismissed because Plaintiffs cannot avoid the effect of the statute of frauds by repleading their breach of contract claim as tort claims; (4) no misrepresentations were made to Faris; (5) Plaintiffs lack standing to bring their DTPA claim because they are not "consumers" within the meaning of the DTPA; and (6) Plaintiff Monsour lacks standing to assert claims on its behalf of Plaintiff Faris or Global PCI, Inc, a company allegedly owned by Monsour.

---

[2]In her affidavit attached to Plaintiffs' Response to the motion for summary judgment, Zeyna Faris states she is the sister of Louis Monsour and that she is suing Defendants for breach of contract, fraudulent inducement, negligent misrepresentation, and violations under the DTPA. (Docket No. 23, Ex. H). She states that she and her brother had an agreement where she would pay the $19,604 to access the line of credit, and her brother would use the line of credit to purchase real estate investment properties. Faris states that she has never had contact with Defendants other than her credit card purchase from Companies, Inc. She claims she is only seeking return of the $19,604 charged to her credit card and fees incurred for the appraisal of 220 West Oak Estates Drive. (Docket No. 4, Ex. B.)

## Standard of Review

A summary judgment movant must show by affidavit or other evidence that there is no genuine issue regarding any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses" and disregarding the evidence favorable to the nonmovant that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000).

**Analysis**

Defendants contend that Plaintiffs lack standing to recover on their breach of contract and tort claims. Standing is implicit in the concept of subject matter jurisdiction, without which the Court has no power to hear Plaintiffs' claims. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 443-44 (Tex. 1993). Therefore, it is proper to question whether Plaintiffs have standing to assert their claims against Defendants before addressing whether each claim should survive summary judgment. In this regard, it is helpful to evaluate the claims against Defendants Wessell and Companies in the following manner: (a) Plaintiff Monsour's claims, (b) Plaintiff Faris's claims, and (c) claims by a partnership entity that Plaintiff Monsour alleges he and his sister had formed.

## I.     Plaintiff Monsour's Claims

Defendants contend that Plaintiff Monsour lacks standing to seek the recovery of Faris's expenditures because there is no evidence that he was personally aggrieved by the alleged wrong. A plaintiff has standing when he is personally aggrieved. *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Specifically, a plaintiff has standing to sue if, *inter alia*, the plaintiff has sustained, or is immediately in danger of sustaining, some direct injury as a result of a complained-of wrongful act. *American Heritage, Inc. v. Nevada Gold & Casino, Inc.*, 259 S.W.3d 816, 820 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The alleged injury must be concrete and particularized and actual or imminent. *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-05 (Tex. 2008). The evidence demonstrates that Zeyna Faris put forth the expenditure of $19,604 that Monsour seeks to recover, and Monsour has not alleged any monetary damages that he

6

individually suffered.[3] Without any showing that Defendants' alleged breach of contract and related

torts have caused him an actual and concrete injury, Monsour has no basis for standing to sue

Defendants, and the Court lacks subject matter jurisdiction over his claims of breach of contract,

fraudulent inducement, and negligent misrepresentation. This, however, does not end the inquiry

regarding Plaintiff Monsour's ability to pursue claims in this suit. *See infra* Parts III-IV.


## II.    Plaintiff Faris's Claims

## A.    Breach of Contract

As Plaintiff Faris claims actual and concrete damages as a result of Defendants' alleged

wrongdoing, Defendants do not contend that she lacks standing to bring her claims; rather,

Defendants allege that because Faris admits she had no contact with Defendants and never made an

agreement with them, she lacks the requisite privity to establish a cause of action on a contract.

Plaintiff Faris, however, provides evidence that she purchased the entity offered by Defendants.

Maintenance of an action for breach of contract generally requires privity between the party damaged

and the party sought to be held liable. *C&C Partners v. Sun Exploration and Production Co.,* 783

S.W.2d 707, 721 (Tex. App.—Dallas, 1989, writ denied)*.*

In her first affidavit, Faris states that she has never personally had any contact with the

Defendants, and that all communications were "directly" through Louis Monsour. (Docket Entry

No. 4, Ex. B.) In her second affidavit, however, Faris claims that she agreed to purchase the item

---

[3]Plaintiff Faris states in her first affidavit (Docket Entry No. 4, Ex. B) that she also seeks
recovery of $2,050 in fees incurred for the appraisal of the property at 220 West Oak Estates
Drive. However, it is unclear which Plaintiff incurred this fee, and no evidence has been
submitted demonstrating that Plaintiff Monsour did so.

advertised by Defendants based on their representations in the website and what Defendants had represented to Monsour. (Docket Entry No. 23, Ex. H.) A Credit Card Billing Authorization Form signed by Faris supports her contention that she made a payment in the amount of $19,604. (Docket Entry No. 23, Ex. I.) This form charges Faris for "the following services: 1) Informative Business Group, LLC." (Docket Entry No. 23, Ex. I.) An e-mail message addressed to Plaintiff Monsour confirms this purchase, reading "We obtained an authorization to charge your credit card for $19604.00[] Purchase Description: Aged Company," indicating that "Informative Business Group, LLC" is an aged company.[4] Plaintiff Faris's expenditure of $19,604 allows her to maintain her claim for breach of contract given her status as the buyer of the program offered by Companies, Incorporated, placing her in privity with Defendants.

## B. Tort Claims

Defendants further contend that Faris may not recover on a claim of fraud or negligent misrepresentation without evidence of a direct communication made to her by Defendants or of an intent on Defendants' part that communications made to another would reach her. In a fraudulent misrepresentation claim in which a misrepresentation is not made directly to the plaintiff, the alleged defendant must "have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct." *Ernst & Young, LLP v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 580 (quoting Restatement (Second) of Torts § 531 (1977)). No evidence in the record indicates that when Defendants made representations to Monsour

---

[4]Monsour states in his second affidavit that Wessell assured him that he could use the line of credit to purchase property under any entity he desired, and that he would not have to use Informative Business Group, LLC, which was purchased from Companies "thus granting [Monsour] access to the guaranteed line of credit held by this company." (Docket No. 23, Ex. D ¶ 12.)

prior to the purchase of the aged company, they were aware of a likelihood that those representations would be communicated to Faris. Faris is thus unable to bring a claim of fraudulent inducement against the Defendants.

Defendants also argue that Faris may not recover for negligent misrepresentation where she has admitted that Defendants had no contact with her. The duty under negligent misrepresentation in Texas "has been narrowly extended beyond parties in contractual privity" and may include parties who foreseeably would rely upon a defendant's representations. *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1297-98 (5th Cir. 1994); *see also Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 234 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Once again, no information in the record would permit an inference that Defendants could foresee that Faris would rely upon representations made to Monsour. Accordingly, Faris lacks the ability to assert a negligent misrepresentation claim on her own behalf.

## III. Plaintiffs' Claims as a Partnership Entity

Both Monsour and Faris testify in their affidavits that they had a partnership agreement in which Faris would pay to access the guaranteed existing line of credit, Monsour would use the credit to purchase real estate investment properties, and any profits from the properties was to be divided equally between Faris and Monsour.[5] A cause of action accruing to a partnership is partnership property, both generally and within the meaning of the Texas Uniform Partnership Act. TEX. REV. CIV. STAT. ANN. art. 6132b; *Cates v. Int'l Tel. & Tel. Corp.*, 756 F.2d 1161, 1173 (5th Cir. 1985).

---

[5]Docket No. 23, Ex. A ¶ 10; Docket No. 23, Ex. H. Plaintiffs' assertion as to the existence of this partnership is the only evidence provided that such an entity exists. Plaintiffs' probability of meeting their burden of production at trial may in part depend upon their ability to produce further evidence that they had indeed formed a partnership entity.

Although a partnership has standing to file suit in its own name, the common law rule that all partners can bring suit themselves on behalf of the partnership in causes of action that are partnership property is still in force. TEX. R. CIV. P. 28; *Chien v. Chen*, 759 S.W.2d 484, 489-491 (Tex. App.—Austin 1988, no writ), *abrogated on other grounds by Williams v. Khalaf*, 802 S.W.2d 651 (Tex. 1990). Based on the available affidavits, both Monsour and Faris have standing to sue on behalf of their partnership for a loss accrued to the partnership, although Monsour lacks standing to sue as an individual and Faris lacks standing to raise her claims based in tort.[6]

Defendants also urge that a company allegedly owned by Monsour, Global IPC, Inc., was seeking the line of credit from a lending institution (Midwest Funding), and that Monsour lacks standing to assert claims regarding "an alleged loan agreement" to Global IPC. Monsour states in his second affidavit that Global IPC is an entity solely owned by him and that the letter from Gordon S. Englert on Midwest Funding letterhead indicated that Global IPC had the available line of credit. However, the letter states that it is "to confirm that the above named corporation has in place a line of credit in the amount of $1,000,000," and it is unclear whether this language refers to the Midwest Funding or to Global IPC, Inc. Furthermore, Monsour asserts in his affidavit that Global IPC never applied for credit, and that Wessell instructed Englert to prepare the letter on behalf of Global IPC. Any reference to Global IPC was made by Defendants or Midwest Funding, and Defendants cannot on that basis assert that Plaintiffs lack standing to assert a breach of contract claim on behalf of another entity.

---

[6]As Monsour and Faris allege a profit-sharing agreement based on the combination of Faris's credit card payment and Monsour's investment efforts, the costs incurred by both could reasonably be considered expenditures by the partnership as a whole.

## A.     Breach of Contract

Defendants assert that no evidence exists of a contractual agreement between Monsour and Companies, and that even if such a contract exists, the alleged document in which Monsour alleges Companies guaranteed a line of credit is not sufficiently definite as to its material terms for a court to fix the legal obligations and liabilities of the parties, and thus unenforceable.  Defendants contend that the only evidence of an agreement is found on an alleged Companies website, which they allege shows that it does not contain terms sufficiently definite to constitute an enforceable contract.

In his affidavit dated June 24, 2009, (Docket No. 23, Ex. A), Plaintiff Monsour states that it was represented to him "at the time of entering the agreement that the agreement terms were those posted on the Defendants [sic] web page at the time of contracting."  Viewing this evidence in the light most favorable to the nonmovant, this implies that Defendants or an agent thereof represented to Monsour that the web page answering "Frequently Asked Questions" about the "aged companies" package represented a contract between Companies and Plaintiffs.[7]  Monsour asserts in his affidavit that he printed this web page (Docket No. 23, Ex. F) and maintained it in his records as proof of the contract.

The printed web page that Monsour alleges was proffered as the contract with Companies states that its high credit companies include, among other things, a "[c]ompany with guaranteed

---

[7] In their Reply in Support of their motion for summary judgment (Docket Entry No.26), Defendants contend that a contract may not arise from alleged representations on a website, relying on *QR Spex, Inc. v. Motorola, Inc.,* 507 F. Supp. 2d 650, 660 (E.D. Tex. 2007).  In *QR Spex.,* however, the issue was whether the website in question could be construed as an "offer to sell," and it had never been represented by an agent of the defendant to be such an offer.  *Id.* Here, Plaintiff Monsour presents evidence that Defendants represented the website as "the contract."

existing $1 million line of credit that is ready to use."[8]  Under "How Does it Work?" item one states,

"[u]p to $1 million will be wired into escrow for the purchase of real estate or other secured items."

Another section is entitled "Can I use the million dollars any way I want?":

> It depends what you want.  If the transaction makes business sense for both you and the lender and is within reasonable parameters, yes.  The money will be wired into escrow to purchase items such as real estate. . . . The lender has great flexibility but no successful lender will blindly wire a million dollars into your account without first taking a look.  100 % of clients who have followed the instructions taught in the training course have been able to obtain financing.

The document never identifies "the lender" referenced in this paragraph by name, and the

paragraph indicates that "the million dollars" is guaranteed pending approval.  The next

section identifies the trainer of the training course as the person who approves of the financing

transactions.  A later section states that "[w]e have letters from the lending company that has

approved the $1 million credit [for the company]."  Again the lending company is not

identified, and in contrast to the paragraph about the use of the million dollars, this section

suggests that the credit has been pre-approved for the "aged company."  Defendants assert that

the "alleged agreement that Companies would 'guarantee a $1 million line of credit' is

fanciful" in part because there is "no evidence" of the specific nature of the obligation to

which Companies allegedly agreed.

   In order to be legally binding, a contract must be sufficiently definite in its terms so

that a court can understand what the promisor undertook.  *T.O. Stanley Boot Co.  v. Bank of*

*El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).  In construing a written contract, the primary

concern of the court is to ascertain the true intentions of the parties as expressed in the

---

[8]The aged companies are also listed as including a two-day training course "on how to maximize your profit using the corporate credit," indicating a pre-existing line of credit.

document. *Frost Nat'l Bank v. L&F Distribs.,* 165 S.W.3d 310, 311-12 (Tex. 2005). A court must first determine whether it is possible to enforce the contract as written, without resort to parol evidence. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003). Here, as Defendants allude, the exact nature of Companies' obligation under the agreement is unclear, but not so vague as to render the contract unenforceable as a matter of law.

If a contract is reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the contract. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex. 1980). Whether a contract is ambiguous is a question of law for the court. *U.S. Quest, Ltd. v. Kimmons,* 228 F.3d 399, 404 (5th Cir. 2000). A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *J.M. Davidson,* 128 S.W. 3d at 231. No single provision taken alone will be given controlling effect in determining if a written contract is ambiguous; rather, all the provisions must be considered with reference to the whole instrument. *Id.* at 229. When an agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a question for the finder of fact. *Childers v. Pumping Sys., Inc.,* 968 F.2d 565, 569 (Tex. 1992).

While the language of several of the website provisions seems plain as to the pre-approved and pre-existing line of credit, the paragraph in the web page under "How does it work?" introduces ambiguity regarding whether the line of credit is "ready to use" only after the approval of an unspecified lender (or the teacher of the training course), in light of the other provisions stating that the line of credit is pre-approved. While Defendants contend that reading the contract to guarantee a $1 million line of credit is "fanciful," this interpretation,

13

which Plaintiff alleges he relied upon in choosing to purchase an aged company, is reasonable in the context of the entire contract and the surrounding circumstances. Issues of material fact exist as to the nature of the line of credit that this contract makes available, as to the timing of the availability of the loan under the contract, and as to whether Monsour fulfilled the conditions, if any, necessary under the contract to gain access to the line of credit. Monsour has also introduced extrinsic evidence tending to show that Defendants made other representations that the line of credit was guaranteed; interpretation of that evidence in relation to context and the language of the web page must be left to the finder of fact.

Defendants also contend that the contract is unenforceable because the website makes clear that interest rates must be negotiated. In a contract to loan money, the material terms generally include the amount to be loaned, maturity dates of the loan, the interest rate, and the repayment terms. *See T .O. Stanley Boot Co.,* 847 S.W.2d at 221. However, Defendants adamantly represent that they "are NOT lenders." (Docket Entry No. 23, Ex. C.) The alleged contract involves only what is included in the package with the purchase of an aged company (*i.e.*, the training courses and the line of credit); a term as to interest rates is not so essential or material in this context that leaving it open to negotiation (based on the type of transaction in which the purchaser intends to use the credit) renders the contract unenforceable.[9]

Defendants' second argument is that no evidence exists that any contract alleged by Plaintiffs complies with the statute of frauds. Under Texas law, a loan agreement in which

---

[9]Similarly, Defendants contend that the absence of evidence as to when Companies' obligation was to be performed renders any agreement too indefinite to be enforced. However, the question of the timing of performance is subsumed under the question of whether the line of credit for the aged company is represented as pre-existing or pre-approved, as the "performance" in question is the extension of the line of credit guaranteed on the web page.

the amount involved exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative. TEX. BUS. & COM. CODE § 26.02(b). Monsour, in his affidavit, represents that he only wanted to purchase the aged company to gain access to the $1 million line of credit, and Defendants use this representation to contend that Plaintiff's alleged unsigned contract falls within the ambit of the statute. As noted, Defendants represent in the online correspondence attached to Plaintiffs' response (Docket Entry No. 26, Ex. C) that Companies is not a lender, and the web page does not state that Companies itself is loaning $1 million. Section 26.02(b) only applies to a "loan agreement" from a "financial institution," and Defendant Companies does not meet the definition of a "financial institution" under § 26.02(a).[10]

Defendants also claim that as there is no evidence that Plaintiffs' alleged contract with Defendants could be performed within one year, it is barred by the general statute of frauds. TEX. BUS. & COM. CODE § 26.01. However, Section 26.01(b)(6) does not apply if the contract, from its terms, could possibly be performed within one year, however improbable performance within one year may be. *Iacono v. Lyons*, 16 S.W.3d 92, 95 (Tex. App.—Houston [1st Dist.] 2000, no pet.); *Miller v. Riata Cadillac Co.,* 517 S.W.2d 773, 775 (Tex. 1974). Where the agreement, either by its terms or by the nature of the required acts, cannot be completed within one year, it falls within the statute. *Niday v. Niday,* 643 S.W.2d 919, 920 (Tex. 1982).

---

[10]"Financial institution" means a state or federally chartered bank, savings bank, savings and loan association, or credit union, a holding company, subsidiary, or affiliate of such an institution, or a lender approved by the United States Secretary of Housing and Urban Development for participation in a mortgage insurance program under the National Housing Act (12 U.S.C. Section 1701 et seq.). TEX. BUS. & COM. CODE § 26.02(a)(1).

The only evidence Defendants have produced that the required acts cannot be completed within one year are statements in Defendant Wessell's declaration that it is his "understanding" that all loans made to Companies's clients have had terms not performable within one year, and that Midwest Funding has loaned money "only under terms that are not performable within one year."[11]   The performance allegedly expected from Defendants, however, was the provision of an aged company with an available line of credit; evidence that the terms a loan from a third party are not performable within one year does not serve as evidence that the contract at issue is barred by the statute of frauds.

## B.    Tort Claims

A cause of action based in fraud requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex.1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990), *cert. denied,* 498 U.S. 1048 (1991). Plaintiffs allege that Defendants fraudulently represented that if Plaintiffs tendered $19,604 to Companies, Defendants would guarantee an existing line of credit of $1 million.  Monsour presents evidence in his affidavit that Defendants made this representation to him verbally and via the alleged web page contract, but he never was able to access a line of credit to purchase real estate properties, which caused injury in the loss of the $19,604.00 spent by his sister and alleged partner in the endeavor, as well as in appraisal fees and other costs.  He asserts that

---

[11]The admissibility of these statements will be considered with Plaintiffs' Motion to Strike.

Defendants made this representation in an effort to persuade Plaintiff to purchase the package and that they altered their web page after Plaintiff complained to them that the web page contained misrepresentations. Viewed in the light most favorable to Plaintiffs, this evidence gives rise to genuine issues of material fact concerning the elements of a fraudulent inducement claim.

To establish a claim for negligent misrepresentation, a plaintiff must show: (1) a representation made by a defendant in the course of its business, or in a transaction in which it has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Monsour declares in his affidavit that Defendants, in the course of persuading him to purchase the aged company package, made representations that contained false information regarding the guaranteed line of credit, leading to the loss of $19,604. It could be reasonably inferred from the evidence regarding these representations and the subsequent alteration (if any) of the content of the web page constituted evidence of a lack of reasonable care in communicating information on Defendants' part. A genuine issue of material fact therefore exists with respect to this claim.

## IV.    Deceptive Trade Practices Claims

In the petition, Plaintiffs allege that Defendants' conduct violated the Texas Deceptive Trade Practices Act (DTPA), TEX. BUS. & COM. CODE §§ 17.01, *et seq.* To prove a violation

of the DTPA, a plaintiff must show "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). In their motion for summary judgment, Defendants contend that Plaintiffs are not consumers because they were only seeking to borrow money, not to purchase or lease a good or service. Plaintiffs must first establish that they are consumers within the meaning of the DTPA. Tex. Bus. & Com. Code § 17.50(a); *Brown v. Bank of Galveston, N.A.*, 963 S.W.2d 511, 513 (Tex. 1998), *abrogated on other grounds by Ford v. Ledesma*, 242 S.W.3d 82 (Tex. 2007). In order to establish DTPA consumer status: (1) Plaintiffs must have sought or acquired goods or services by purchase or lease, and (2) the goods or services purchased or leased must form the basis of the complaint. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351-52 (Tex. 1987).[12]

Defendants point to Monsour's repeated representations that he was not interested in the other services Companies provided, but only in acquiring a line of credit. Plaintiffs respond that Defendants provided them with a "package" that included a company with an existing line of credit, a two-day training course, two hours of consultation with a course trainer, and a six-month corporate credit coach. While Defendants are not lenders themselves and Monsour may have expressed his goal of obtaining a line of credit, it appears from the available evidence that he acquired the items offered by Defendants to enhance his ability to

---

[12] "Goods" are defined as "tangible chattels or real property purchased or leased for use." Tex. Bus. & Com. Code § 17.45(1). "Services" are defined as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Tex. Bus. & Com. Code § 17.45(2).

obtain that line credit.[13]  Consequently, Monsour purchased a service for his use, which

qualifies as a service under the defined terms of the Act.

The DTPA also excludes those transactions that convey wholly intangible property

rights. *Fisher Controls Int'l v. Gibbons*, 911 S.W.2d 135,138-39 (Tex. App.—Houston [1st

Dist.] 1995, writ denied).  When a transaction's central objective is the acquisition of an

intangible, a plaintiff must produce uncontroverted evidence in order to establish as a matter

of law that a collateral service was an objective of the transaction and not merely incidental

to the performance of a transaction excluded under the DTPA.  *Fed. Deposit Ins. Co. v. Munn*,

804 F.2d 860, 865 (5th. Cir. 1986).  In its evaluation of intangible property rights and

incidental services under Texas law, the Fifth Circuit Court of Appeals recognized a category

of cases "in which the court grants consumer status even though an important objective is the

purchase of an intangible, for the service that forms the basis of the complaint is also an

important objective of the transaction and hence is a purchased 'service.'"  *Id.* at 865.  As the

Fifth Circuit noted, making such a determination may prove difficult.  *See id.* ("Unfortunately,

[Texas case law] does not clearly identify when an activity is an objective of a transaction that

---

[13]While Plaintiffs rely on the Texas Supreme Court's ruling in *Riverside National Bank v. Lewis*, 603 S.W.2d 169 (Tex.1980), for the contention that an individual does not qualify as a consumer by applying for an extension of credit, Defendants ask this Court for broader application of the case than intended by the Texas Supreme Court.  *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 566 (Tex. 1984) (stating that the Texas Supreme Court had twice limited *Riverside National Bank v. Lewis* to its facts).  In *Lewis*, the plaintiff loan applicant sought a loan from the defendant financial institution.  603 S.W.2d at 171.  Here, unlike the parties in *Lewis*, Plaintiff is not a loan applicant, and Defendants are not financial institutions or direct lenders.  Consequently, *Lewis* is distinguishable from the case at hand, thereby, preventing this Court from relying on its holding to grant a motion for summary judgment.

also involves an intangible and when the activity is merely incidental to the central objective of acquiring the intangible." (citing *First Federal Savings & Loan Association v. Ritenour*, 704 S.W.2d 895 (Tex. App.—Corpus Christi 1986))).

While Defendants' focus on Plaintiffs' ultimate objective to obtain a line of credit in the motion for summary judgment, the cases in which Texas courts have typically refrained from conferring consumer status provide this Court with some guidance and render this case distinguishable.[14] While the Plaintiffs do reference their ultimate goal to obtain a line of credit in their petition, Plaintiffs point out that the service being offered is the "assisting [of] clients in obtaining credit from financial institutions." (Docket Entry No. 21 ¶ 23). Many of the cases in which a Texas court was unwilling to confer consumer status involved financial institutions. *See, e.g., La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 567 (Tex. 1984) (defendant bank), *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980) (defendant bank); *Maginn v. Norwest Mortg., Inc.*, 919 S.W.2d 164, 167 (Tex. App.—Austin 1996, no writ) (defendant mortgage company). Here, it is undisputed that Defendants do not operate a financial institution. It was not possible for Plaintiffs to acquire a line of credit from Defendants; they could only purchase the program offered by Defendants in the hopes of eventually obtaining a line of credit. As a result, the Plaintiffs purchased a

---

[14]As the Fifth Circuit Court of Appeals stated: "We expect that in most cases, the facts will be sufficiently clear that a judge can rule as a matter of law on DTPA consumer status." *Fed. Deposit Ins. Co. v. Munn*, 804 F.2d 860, 865 n.1 (5th. Cir. 1986). Given the distinguishing features of the Defendants in this case from the defendants in cases in which Texas courts have declined to confer consumer status on the plaintiff, this Court finds it is unnecessary to evaluate whether the collateral services were an objective of the transaction or incidental to the transaction as a question of fact rather than a question of law. *See id.* at 865 ("When the evidence is controverted . . . the question is one of fact and must be submitted to the jury.").

service from the Defendants, qualifying Monsour and Faris as "consumers" under the DTPA. As a result, Plaintiffs Monsour and Faris[15] may pursue their claims under the DTPA.

### Plaintiffs' Motion to Strike Defendants' Summary Judgment Evidence

Plaintiffs ask the Court to strike the last sentence of paragraph four and the last sentence of paragraph six of the Declaration of Kevin Wessell as impermissible summary judgment evidence. (Docket Entry No. 24.) (referring to Docket No. 21 app. 1.) Plaintiffs contend that the statements contained in these sentences are based on hearsay rather than personal knowledge and therefore, inadmissible as summary judgment evidence. *See* Fed. R. Civ. P. 56(e)(1); *Madison One Holdings, LLC v. Punch Int'l, NV*, No. 4:06-CV-3560, 2009 WL 911984, at *11 (S.D. Tex. Mar. 31, 2009) (noting that Fed. R. Evid. 802, the hearsay rule, applies with "equal force" in the context of summary judgment evidence).

The last sentence of paragraph four of Wessell's declaration reads, "[m]oreover, to my understanding all loans made to our clients have had terms that are not performable within one year." This statement refers to loans obtained by Companies' clients through agreements between the clients and several lenders named by Wessell. The last sentence of paragraph six notes that Midwest Funding & Financial Corporation "has loaned money, but only under terms that are not performable within one year." Plaintiffs argue that Wessell's understanding regarding the time required for performance "would be coming from third parties" and that

---

[15]Defendants briefly state without providing any authority that Plaintiff Faris cannot be a consumer because she claims she has not had any contact with Defendants. This is contradicted by evidence that Monsour used Faris's credit card —possibly as part of an agreement between the two —to purchase the program offered by Defendants. This transaction places Faris in privity with the Defendants.

Wessell does not have personal knowledge as to the lending practices and procedures of independent banking institution.

Though Plaintiffs infer that any understanding Wessell had regarding the terms of a loan between a client and a third-party lender would come from a third party, this is not evident on the face of Wessell's declaration. Wessell need not have been involved in the creation of loan contracts between Companies' clients and Midwest Funding (or another lender) to have personal knowledge of the terms of such loans. *See Hamilton v. Trover Solutions, Inc.*, 104 Fed. App'x 942, 944 (5th Cir. 2004) (finding that an affiant may have personal knowledge of activities in which she has not actually participated). Personal knowledge may be inferred from the position of the individual making the statement and the nature of their participation in the matters to which they swore. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). Wessell states in paragraph seven of his declaration that he has personal knowledge of the facts stated therein "based on, among other things, [his] work as the president of Companies Incorporated." Given that Companies was, at the least, involved in working with its clients and lenders regarding loans for real estate investment purposes,[16] it can be reasonably inferred that the president of Companies might have personal knowledge of the basic terms of those loans. Nothing in Wessell's Declaration controverts his sworn statement as to his personal knowledge, and the Declaration is therefore admissible as summary judgment evidence. Consequently, Plaintiffs' motion to strike (Docket Entry No. 24) is DENIED.

---

[16]*See* Plaintiff Monsour's second affidavit for a discussion of Wessell's involvement in meeting with representatives of Midwest Funding and other lending institutions. (Docket Entry No. 23, Ex. A.)

**Conclusion**

Plaintiff Monsour's individual claims are dismissed for lack of standing. For the reasons discussed herein, Defendants' motion for summary judgment is GRANTED as to Plaintiff Faris's tort claims. As genuine issues of material fact exist for the remaining claims brought by Plaintiffs as a partnership entity and Plaintiff Faris's contract claims, the motion for summary judgment as to those claims is DENIED. Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' DTPA claims. Plaintiffs' motion to strike summary judgment evidence is also hereby DENIED.

It is so ORDERED.

SIGNED this 24th day of August, 2009.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE